UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

OMRAN AL-KHAZRAJI,

                              Plaintiff,
    v.                                              **DECISION AND ORDER**
                                                              09-CV-521S
UNITED STATES OF AMERICA, DEPARTMENT
OF THE ARMY,

                              Defendant.
_____

## I.  INTRODUCTION

Plaintiff Omran Al-Khazraji commenced this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346 and 2671 *et seq*., against the United States Department of the Army seeking damages for injuries he sustained while employed as a role player in military training scenarios.  Pending before this Court is Defendant's motion to substitute the United States for the Department of the Army as defendant in this action, and to dismiss Plaintiff's complaint pursuant to Fed. R. Civ. P. 12 (b)(1) for lack of subject matter jurisdiction.  For the reasons discussed below, this Court finds the matter fully briefed and oral argument unnecessary, and further concludes that Defendant's motion should be granted in its entirety.

## II.  BACKGROUND

Plaintiff, who immigrated to the United States from Iraq in 1997, was employed as a Foreign Language Speaking ("FLS") role player by non-party Goldbelt Eagle LLC ("Goldbelt") for training exercises on military bases.  (Declaration of Plaintiff Omran Al-Khazraji, Docket No. 23, ¶¶ 1, 6, 9, 11-15, Ex A; Deposition of Plaintiff, Docket No. 18-1,

at 14, 16). On October 4, 2006, Plaintiff was playing the role of a Civilian on the Battlefield ("COB"), specifically a sheik, in a military training scenario being conducted at Fort Dix in New Jersey. (Complaint, Docket No. 1, ¶¶ 5-7; Pl's Decl. ¶ 24). During the course of the training scenario, a Hand Grenade Simulator ("HGS") was thrown by a U.S. Army sergeant that was intended to land in a detonation pit in the training lane, however, the HGS failed to hit that target. (Deposition of Master Sergeant Darrell Eugene Lyon, Docket No. 18-2, at 19-20, 29-36, 39-40). Plaintiff "was struck by shrapnel and debris from [this] explosive device." (Complaint ¶ 6).

In April 2007, Plaintiff submitted a claim to the Department of the Army seeking two million dollars for injuries sustained to his neck and left shoulder as a result of this incident, (Docket No. 18-2 at 2), and this claim was amended in August 2008 to reflect four million dollars in alleged damages. (Complaint ¶ 14). These claims were rejected by the Department of the Army in January 2009. (Complaint ¶ 14). Plaintiff commenced the instant action on June 3, 2009, alleging that this Court has jurisdiction over his personal injury claim pursuant to 28 U.S.C. § 1346 (b).[1] (Complaint ¶ 1). Defendant asserted the lack of subject matter jurisdiction as an affirmative defense in its Answer (Docket No. 5) and its Amended Answer (Docket No. 12), and now moves pursuant to Rule 12 (b)(1) to dismiss the complaint on that ground. (Docket No. 17).[2] Defendant also seeks an order

---

[1] Plaintiff's Complaint refers to "28 U.S.C. §1348(b)" as the basis for jurisdiction. This appears, however, to be a typographical error, and indeed Defendant has treated it as such. (See Def's Mem. of Law, Docket No. 20, at 1).

[2] In support of its motion for substitution and dismissal (Docket No. 17), Defendant submitted the Declaration of Michael S. Cerrone, Esq. (Docket No. 18) with Exhibits A-N (Docket Nos. 18-1 to 18-3), the Declaration of Sergeant First Class Michael J. Kriewaldt (Docket No. 19), and a supporting Memorandum of Law (Docket No. 20). Plaintiff responded with the Declaration of Harry G. Modeas, Jr., Esq. (Docket No. 22) with Exhibits A-L (Docket Nos. 22-1 to 22-12), the Declaration of Plaintiff Omran Al-Khazraji (Docket No. 23), and an opposing Memorandum of Law (Docket No. 25). Defendant filed a reply

substituting the United States for the Department of the Army as defendant. (Docket No. 17).

### III. DISCUSSION

"A motion to dismiss under Rule 12 (b)(1) for lack of subject matter jurisdiction can raise a facial challenge based on the pleadings, or a factual challenge based on extrinsic evidence." SEG Vanguard General Corp. v. Ji, 195 F.Supp.2d 564, 566 (S.D.N.Y. 2002)(internal quotation marks omitted). Where, as here, a factual challenge is raised, "the court may resolve [any] disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits." Zappia Middle East Const. Co. Ltd. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000). The party asserting jurisdiction has the burden of showing by a preponderance of the evidence that subject matter jurisdiction exists, and such a showing "is not made by drawing from the pleadings inferences favorable to [that party]." APWU v. Potter, 343 F.3d 619, 623 (2d Cir.2003) (internal citation and quotation marks omitted); see Hamm v. United States, 483 F.3d 135, 137 (2d Cir. 2007).

Plaintiff asserts that this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1346 (b), which provides that district courts "shall have exclusive jurisdiction of civil actions on claims against the *United States*" (emphasis added). Initially, Plaintiff correctly concedes that the United States, rather than the Department of the Army, is the proper and only party that can be sued pursuant to § 1346. Pl's Mem. of Law, Docket No. 25, at 1; See 28 U.S.C. § 2679 (a)(the authority of a federal agency to sue and be sued does not authorize suits against an individual federal agency under § 1346); Myers & Myers, Inc. v.

---

Memorandum of Law (Docket No. 26).

U.S. Postal Serv., 527 F.2d 1252, 1256 (2d Cir. 1975)(suit under the FTCA lies, if at all, only against the United States); Fisko v. U.S. General Serv. Admin., 395 F.Supp.2d 57, 59 (S.D.N.Y. 2005)(same).  That part of Defendant's motion seeking substitution is therefore granted.  Further, under the principle of sovereign immunity, it is axiomatic that the United States may not be sued without its consent.  Adeleke v. United States, 355 F.3d 144, 150 (2d Cir. 2004), citing United States v. Mitchell, 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). Thus, where, as here, the United States is the defendant, a court's jurisdiction is defined by the terms of the United States' consent to be sued. See Hamm, 483 F.3d at 137; Wake v. United States, 89 F.3d 53, 57 (2d Cir. 1996).

### A.     United States as Special Employer

In enacting § 1346, Congress waived sovereign immunity with respect to certain suits against the United States, including, as relevant here:

> personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346 (b)(1). Defendant argues that, even if a private person, the United States could not be held liable to Plaintiff in the instant case in accordance with the law of New Jersey, where the incident occurred, because his claim is barred under New Jersey's workers' compensation scheme. (Def's Mem. of Law, Docket No. 20, at 5-11).

"It is well settled under New Jersey law that an employee may have two employers for purposes of the work[ers'] compensation scheme - a primary employer and a 'special' employer," both of whom may be liable to that employee for workers' compensation. Roma v. United States, 344 F.3d 352, 364 (3d Cir. 2003), cert denied 543 U.S. 874 (2004);

4

Blessing v. T.Shriver & Co., 228 A2d 711, 713 (N.J.Super.A.D. 1967). "[R]ecovery against one bars the employee from maintaining a tort action against the other for the same injury." Antheunisse v. Tiffany & Co., Inc., 551 A.2d 1006, 1007 (N.J.Super.A.D. 1998), certif. denied 115 N.J. 59 (1989); see Blessing, 344 A.2d 713. Here, Plaintiff concedes that he is receiving workers' compensation benefits as a result of his injury at Fort Dix. Pl's Dep. at 61-62. Defendant argues that it was a special employer of Plaintiff within the meaning of New Jersey's workers' compensation scheme, and therefore Plaintiff is barred from seeking further compensation from it.

Under New Jersey law, to determine whether a plaintiff is a 'special employee' of a defendant for workers' compensation purposes, a three-prong test is generally applied. Roma, 344 F.3d at 364; see Volb v. G.E. Capital Corp., 651 A2d 1002, 1005 (N.J. 1995).

> When a general employer lends an employee to a special employer, the special employer becomes liable for work[ers'] compensation only if:
>
> (a) The employee has made a contract of hire, express or implied, with the special employer;
>
> (b) The work being done is essentially that of the special employer; and
>
> (c) The special employer has the right to control the details of the work.

Blessing, 228 A2d at 713, quoting 1A Larson, Workmen's Compensation § 48.00, (1966), p.710; Volb, 651 A2d at 1005. Some New Jersey courts have also found significant (d) whether the special employer pays the employee's wages and (e) whether the special employer has the power to hire, discharge, or recall the employee. Roma, 344 F.3d at 364; Blessing, 228 A2d at 713. "None of these factors is necessarily dispositive, and not all five must be satisfied in order for a special employment relationship to exist." Marino v.

5

Industrial Crating Co., 358 F.3d 241, 244 (3d Cir. 2004), citing Blessing, 228 A2d at 715. The Supreme Court of New Jersey has stated, however, that "the most important factor in determining a special employee's status is whether the borrowing employer had the right to control the special employee's work." Volb, 651 A2d at 1005; Roma, 344 F3d at 364.

      Plaintiff argues that Defendant lacked any significant control over his work as a role player because he "was supervised by his Goldbelt field manager and his team leader," from whom he received training, costuming, and equipment. Pl's Mem. of Law at 9; Pl's Dep. at 23. Plaintiff highlights that the contract between Goldbelt and Defendant describes the scope of Goldbelt's work generally as "provid[ing] labor and supervision necessary to train U.S. military, other DoD and federal agency personnel in support of Operation Iraqi Freedom (OIF) and Operation Enduring Freedom (OEF) at Fort Dix and other locations." Contract, Docket Nos. 18-1 and 22-4, ¶ 1.1. Further, at his deposition, he testified that he received his instructions from only his team leader "Harath" while participating in training scenarios at Fort Dix, and he never received commands from military personnel. Pl's Dep at 23, 35-36; see Pl's Decl. ¶¶ 16, 22-23. Plaintiff's argument on this point relies almost exclusively on these assertions, which are noticeably lacking in supporting detail. See Zappia Middle East Const. Co. Ltd, 215 F.3d at 253 (a party cannot rely solely on conclusory allegations in response to a Rule 12 (b)(1) motion to dismiss). Further, Plaintiff's assertions are contradicted by the deposition testimony of Goldbelt employees and Fort Dix military personnel, as well as the contract between Goldbelt and Defendant.

      The governing contract makes clear that it is Defendant, not Goldbelt, that is in charge of the details of how training occurs, particularly with respect to the role players such as Plaintiff. The contract specifies that Goldbelt will provide "all required labo[r] to

6

include Project Manager, Assistant Project Manager, Field Manager, 4 Team Leaders, 30 FLS Role Players and 95 Role Players." Contract, Docket No. 22-4 at 4.  Despite the requirement that Goldbelt provide supervisors, "*[a]ll* Contract employees will be *trained* at the COB/FLS orientation provided *by the 5th Training Brigade* prior to performing the OB, FLS, OPFOR, translator, detainee and casualty roles." Contract ¶ 1.3.2.5 (emphasis added).  The contract also reflects that "[a]ll contractor employees will receive a safety briefing *from the military representative* prior to the beginning of the training period," including "instruction on safe and appropriate interaction with personnel being trained." Contract, Docket No. 22-4, ¶ 1.12.1.  It therefore appears that even Goldbelt supervisors were subject to training and supervision by Defendant.  Thus, even if Plaintiff was never given instructions directly by military personnel, a factual finding this Court does not make, Defendant still had the *right* to control the details of Plaintiff's work which, under New Jersey law, is a more determinative factor than the exercise of control itself.  Kelly v. Geriatric & Med. Servs., Inc., 671 A.2d 631, 635 (N.J. Super.A.D. 1996), affd  685 A.2d 943 (N.J. 1996) (fact that an employer has the right to control duties determinative even where an employee has expertise sufficient to render direction largely unnecessary).

The contract further states that Goldbelt was to provide "appropriate foreign-language-speaking personnel as role-players to support [training] lane exercises during normal operating hours," and that such personnel "will integrate into *existing* Civilian on the Battlefield training exercises" as scheduled by Defendant.  Contract ¶ 3.1.3 (emphasis added).  Personnel provided by Goldbelt would be used to "augment military training." Contract ¶ 3.1.  The hours for which Goldbelt was to provide foreign language speaking role players and COBs could be "tailored to meet the needs of the mission readiness

exercise," and Defendant specifically reserved "the right to change COB requirements to meet the training mission at any time during the contract." Contract ¶¶ 1.7.1; 1.7.4; 3.4.

Further, the deposition testimony also supports the conclusion that, practically speaking, control over Plaintiff's specific duties rested with Defendant. Aubrey Herrin, Goldbelt's project manager during the Fort Dix contract in question, testified that Goldbelt did not "really play any role" with respect to training simulations "other than providing civilian workers" as role players. Deposition of Aubrey Herrin, Docket Nos. 18-1 and 22-5, at 15, 17, 23, 27, 44. Defendant would send Goldbelt a schedule of "what [training] lanes they were running, the times they were supposed to run from and how many folks they wanted divided by . . . COBs, civilians on the battle field, and the FLS role players," and Herrin would turn that information into a schedule. Herrin Dep at 23-24. Herrin specifically denied that Goldbelt personnel "coordinate[d] any training," and also denied ever observing a training simulation with a Goldbelt employee in charge. Herrin Dep at 26-27. Instead, every training lane was supervised by military personnel, "observer controllers" who were "the ones that directed the role players as to what to do, as well as grading the soldiers for how they performed." Herrin Dep at 26-27. Goldbelt field managers and team leaders "would typically sign folks in to the [training] lane," issue training weapons and uniforms as necessary, and then Goldbelt supervisors "pretty much lost all control until . . . the exercise index ended." Herrin Dep at 30-32, 46, 70. Any assertion that role players never received instruction from military personnel was, in Herrin's opinion, untrue, as "[t]he military scenarios, they change[d] as the war changed . . . the only people who would know what they are supposed to be doing every day were the [officers in charge]. And they didn't do the same scenarios every day." Herrin Dep at 31.

8

Kimo Kelly McEwen, a deputy program manager that worked on Goldbelt contracts, including those at Fort Dix, similarly testified that Goldbelt team leaders "were there at the beginning of each [training] lane, and they would sign everybody in, take attendance, make sure everybody had the proper equipment with them before they went in, and then hand over a copy of the roster to the Army's observer/controller or the person in charge of that lane." Deposition of Kimo Kelly McEwen, Docket No. 18-2, at 13-18, 33-34. Instructions regarding the training scenario, the roles to be played, the objective of the exercise, and a safety briefing were given by military personnel. (McEwen Dep at 35-38). McEwen explained that, if Goldbelt personnel conveyed operational information, that information would have come from Defendant first. McEwen Dep at 37-38.

Defendant also offered the deposition testimony of Master Sergeant Darren Eugene Lyon, who was the Non-Commissioned Officer in Charge of the Dismounted Improvised Explosive Device training lane on the day Plaintiff was injured. Lyon Dep. at 5-8, 19-20. Lyon similarly testified that Goldbelt personnel would bring the role players to the training lane, "give them their briefing or take their attendance," and then the role players would be handed off to Sergeant Collo, whose "whole job is to work with all the COB[s] . . . he was pretty much their liaison." Lyon Dep at 12-13, 20. Sergeant Collo would give the role players a safety briefing every morning that had been prepared by Army personnel, as he did on the morning of Plaintiff's injury, and then they would be told about the training scenario, "exactly what was going to happen and where they should go at that time when it actually happened." Lyon Dep at 21-22, 23-26. Lyon explained that the instructions given to the role players was dependent on how the soldiers acted and reacted to the situation presented, and if the soldiers did not pass the exercise on the first round, changes would

be made to the scenario and the exercise would be conducted again. Lyon Dep. at 13-17.

In light of the terms of the contract between Goldbelt and Defendant, as well as the deposition testimony, this Court concludes that, although Plaintiff was hired by Goldbelt and Goldbelt supervisors were present at Fort Dix, "the right to direct the on-site work assignments and to control that work lay with [Defendant]." Kelly, 671 A.2d at 636. Notably, Defendant also "had full control over whether [Plaintiff] would continue to work at [Fort Dix] and indeed whether [he] would ever again work at any of its other facilities." Kelly, 671 A2d at 636. Pursuant to the contract, Defendant had "the right to restrict the employment . . . of any contractor employee, or prospective employee, who is identified as a potential threat to the health, safety, security, and general well being or operational mission of the installation and its population." Contract ¶ 1.3.2.4. Indeed, several weeks after his injury, Plaintiff himself was issued a formal order of ejection from the base, and his contractor identification card seized, as a result of his alleged participation in an altercation. Pl's Dep at 72-73; Docket No. 18-3 (incident report). Contrary to Plaintiff's contention that Defendant's ability to expel Plaintiff from a military facility is of no moment, New Jersey courts have found that the right to control whether an employee would be assigned to a certain location is "the functional equivalent of the power to discharge" that employee. Kelly, 671 A.2d at 636; Gore v. Hepworth, 720 A.2d 350, 354 (N.J. Super. A.D. 1998), certif. denied, 726 A.2d 934 (N.J. 1999). Here, Defendant could and did "discharge" Plaintiff from his employment at Fort Dix. Kelly, 671 A.2d at 636; Gore, 720 A.2d at 354.

Also relevant to both the issue of control and the existence of an express or implied contract relationship, discussed further below, is whether the employee was engaged in the business of his general employer or the business of the purported special employer at

the time in question. As Plaintiff notes, there is an inference under New Jersey law that an "employee remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer." Murin v. Frapaul Const. Co., 573 A.2d 989, 993 (N.J.Super.A.D. 1990). Nonetheless, Plaintiff's argument that he was performing the work of Goldbelt, not Defendant, at the time he was injured is without merit. See Pl's Mem. of Law, at 5-7. Plaintiff cannot claim that Goldbelt was engaged in the business of performing overseas military operations, and there is no dispute that preparation for such overseas operations was the purpose of the training exercises for which Goldbelt provided supporting personnel.

By way of comparison, in Kelly v. Geriatric & Med. Servs., Inc., although the plaintiff, a licensed practical nurse, was an employee of a temporary staffing firm, the court found that she was also a special employee of the defendant health care facility at which she was placed, in part because there was no dispute that "the regular business activity of plaintiff's general employer . . . was the placing of nursing in temporary employment," whereas the nursing duties the plaintiff actually performed were in furtherance of the health care business of the defendant. Kelly, 671 A.2d 631, 633, 636 (N.J. Super.A.D. 1996), affd 685 A.2d 943 (N.J. 1996). In contrast, the plaintiff in Blessing had been assigned by his general employer, a detective agency, to work as a security guard at the purported special employer's foundry. 228 A.2d at 712. That plaintiff's specific duties were dictated by his general employer and included patrolling for fires, theft, and other hazards, duties more related to the general employer's business of providing security than the purported special employer's business of manufacturing. Blessing, 228 A.2d at 712, 716. As such, the Blessing court found that any control over the plaintiff exercised by the purported special

11

employer was minimal, and there was no basis for predicating an employee relationship between the two.  228 A.2d at 716.  The instant case is much more akin to <u>Kelly</u>, and as such falls within the category of "employment agency cases, in which the employee is almost universally held to be a 'special employee' of the business employer that has hired him as a temporary helper." <u>Marino</u>, 358 F.3d at 247.

"[B]ecause the employee loses certain rights along with those he gains when he enters a new employment relationship," such as "the right to sue the special employer at common law for negligence," New Jersey courts also consider whether an employee consented to the employment relationship <u>Murin</u>, 573 A.2d at 993.  Although no express contract of employment between Plaintiff and Defendant existed here, an implied contract can be found where a special employee's acceptance of an employment relationship with the special employer is manifest from the circumstances.  <u>Kelly</u>, 671 A.2d at 634; <u>Antheunisse</u>, 551 A.2d at 1007-1008. For example, implied consent has been found where an employee knew that the general employer would hire him or her out to various employers, and the employee accepted the terms of employment with the special employer by complying with that new employer's direction and control. <u>Kelly</u>, 671 A.2d at 634; <u>Antheunisse</u>, 551 A.2d at 1008.

Here, Plaintiff had previously been hired by Goldbelt to work as a FLS role player in connection with other contracts at Fort Dix and at Fort Drum in New York. Pl's Decl. ¶¶ 9, 12-14 (Plaintiff first hired by Goldbelt in 2004); <u>see</u> Contract, Docket No. 22-4 (contract governing at the time of Plaintiff's injury was effective July 25, 2006).  He was therefore aware of what the terms and conditions of his employment at Fort Dix would be when he was hired by Goldbelt to work there.  See Pl's Decl. ¶¶ 12-14, Ex. A.  Moreover, Defendant

directly provided all Goldbelt contract employees meals, as well as lodging for non-local employees such as Plaintiff. Contract ¶ 1.11.1.2; see Complaint ¶ 2; Pl's Decl. Ex A; Docket No. 18-3 (Plaintiff is a Buffalo, New York resident and the altercation in which he allegedly participated took place with his roommates in Defendant's barracks). Under these circumstances, the record supports the conclusion that Plaintiff implicitly consented to an employment relationship with Defendant. See Antheunisse, 551 A.2d at 1008 (plaintiff impliedly contracted with special employer by voluntarily reporting to work and accepting training and guidance provided by that employer). Finally, the fact that Plaintiff may have been paid by Goldbelt is of no moment where, as here, "[t]he money used to pay [his] wages came indirectly out of the fees paid by defendant for plaintiff's services." Kelly, 671 A.2d at 636; see Contract, Docket No. 22-4 at 4 (itemizing labor costs, including costs for FLS Role Players, at $3,995,587.84).

In sum, the preponderance of the evidence does not support Plaintiff's conclusory assertions that he never received direction, control or supervision from Defendant's personnel at Fort Dix. See generally APWU, 343 F.3d at 623. Instead, the record establishes that: (1) Plaintiff implicitly consented to an employment contract with Defendant; (2) Plaintiff, by participating in the military training scenarios, was essentially performing the work of Defendant; (3) Defendant had the right to control the details of Plaintiff's work; (4) Defendant's authority to preclude Plaintiff from Fort Dix and other military bases contract constitutes the ability to 'discharge' him; and (5) Defendant paid Plaintiff's wages indirectly and provided him directly with food and lodging as part of his employment. See generally Volb, 651 A.2d at 1005; Blessing, 228 A.2d at 713. This Court therefore concludes that Plaintiff was a special employee of Defendant for the purposes

of New Jersey's workers' compensation scheme, and as such, Plaintiff is precluded from maintaining the present tort action against Defendant. Kelly, 671 A.2d at 636; Antheunisse, 551 A.2d at 1007; Blessing, 344 A2d 713. Because Defendant cannot be held liable in accordance with the law of the place where the act or omission occurred, this Court lacks subject matter jurisdiction over the case. See 28 U.S.C. § 1346 (b).

**B.     The Discretionary Function Exception**

Defendant argues in the alternative that this Court also lacks subject matter jurisdiction because his claim is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused," 28 U.S.C. § 2680 (a), and such discretionary activities are specifically exempted from § 1346 (b)'s waiver of immunity. Id. Because this Court has already determined that it lacks subject matter jurisdiction, this issue will be considered only briefly. The discretionary function exception "protects only governmental actions and decisions based upon public policy." Berkovitz v. United States, 486 U.S. 531, 537, 108 S.Ct. 1954, 100 L.E.2d. 531 (1988). Specifically, suit is barred where (1) the acts alleged to be negligent are discretionary, "in that they involve an 'element of judgment or choice' and are not compelled by statute or regulation," and (2) "the judgment or choice in question must be grounded in 'considerations of public policy' or susceptible to policy analysis." Coulthurst v. United States, 214 F.3d 106, 109 (2d Cir. 2000), citing United States v. Gaubert, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) and Berkovitz, 486 U.S. at 536-537.

Defendant argues that the discretionary function exception applies in this case because the Army exercises significant discretion in determining whether or not to use

simulated explosives as part of training scenarios, such as the HGS that allegedly caused Plaintiff's injury, a decision that requires the balancing of the need for combat readiness against "the modest safety concerns raised with the use of simulated explosives." Def's Mem. of Law at 22-23. Plaintiff responds that he is not challenging the use of simulated explosives during training, but instead he is alleging that the Hand Grenade Simulator was not handled properly on the day of his injury. Pl's Mem. of Law at 11-12. A fair reading of the Complaint supports Plaintiff's argument that this case "involves negligence unrelated to any plausible policy objectives." Coulthurst, 214 F.3d at 111. Plaintiff specifically alleges that Defendant was negligent in failing to provide a safe work environment; "detonating the explosive device at a time and in an area where it could cause injury to the Plaintiff;" failing to warn of the detonation, and failing to employ proper safety standards when detonating the explosive device. Complaint ¶ 8. Plaintiff's claim is therefore not based on a policy determination that simulated explosive devices were necessary for the proper preparation of combat soldiers, but rather it is grounded in the allegation that Defendant's employees handled an explosive device negligently, thereby creating an unsafe work environment that resulted in injury to Plaintiff. See Coulthurst, 214 F.3d at 111 (failure to properly inspect equipment or report damage to same are examples of negligence outside the scope of the discretionary function exception). The discretionary function exception is therefore not applicable in the instant case.

### IV. CONCLUSION

In opposition to Defendant's factual challenge, Plaintiff failed to establish by a preponderance of the evidence that subject matter jurisdiction exists. Defendant's motion to dismiss the complaint is therefore granted.

15

## V.  ORDERS

IT HEREBY IS ORDERED that Defendant's Motion for Substitution of the United States as Defendant and Dismissal pursuant to Rule 12 (b)(1) (Docket No. 17) is GRANTED;

FURTHER, that the Clerk of the Court is directed to take the necessary steps to close this case.

SO ORDERED.


Dated:   February 20, 2012
         Buffalo, New York

                                                       /s/William M. Skretny
                                                      WILLIAM M. SKRETNY
                                                           Chief Judge
                                                    United States District Judge